**HOLLY A. SULLIVAN**
California State Bar No. 216376
**THEO J. TORRES**
California State Bar No. 324059
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Holly_Sullivan@fd.org

Attorneys for Mr. Fencl

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>   v.<br><br>JOHN FENCL,<br><br>              Defendant. | CASE NO.:  21-CR-3101-JLS<br><br>**MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER DENYING MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE** |

## I.    Introduction

Mr. Fencl hereby moves this court for a review of the magistrate judge's Order denying Mr. Fencl's motion to modify his conditions of pretrial release to remove Standard Condition 4, which bars him from possessing or attempting to possess a firearm, destructive device or other dangerous weapon and ordering him to legally transfer all firearms as directed by Pretrial Services. (Doc. 72.)  The reason for this request is that the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), renders unconstitutional both Standard Condition 4 and 18 U.S.C. § 3142(c)(1)(B)(viii). The Magistrate Judge's decision denying the motion to modify is therefore inconsistent with *Bruen*.

Three considerations in particular support this conclusion. First, no binding case law forecloses this challenge. Neither the Ninth Circuit nor the Supreme Court has considered the Second Amendment rights of pretrial releasees. Second, the government cannot meet its burden under *Bruen* to show historical regulations distinctly similar to Standard Condition 4. As the magistrate judge found, "[r]estrictions on firearms possession as a condition of pretrial release were not enacted until . . . 1984." Doc. 72 at 2. Third, at least one district judge has concluded that a related regulation—a law prohibiting indicted persons from transferring firearms, 18 U.S.C. § 922(n)—is unconstitutional under *Bruen*. *United States v. Quiroz*, 2022 WL 4352482, *4 (W.D. Tex. Sept. 19, 2022). For these reasons and the others given below, this Court should grant this motion.

## II.   Background

John Fencl is a long-time business owner, resident, and gun collector in San Diego County. He is a United States citizen who has lived in the same residence in El Cajon, California for thirteen years. For nearly thirty-five years he has worked as a truck mechanic and has owned his own business acting as a mobile truck repairman. This position requires Mr. Fencl to travel into less-populated areas, at all times of the day and night, with great frequency. Mr. Fencl desires a firearm for protection and self-defense.

John Fencl has a concealed carry permit in Utah but did not have a concealed carry permit in California. For this reason, in October of 2019, Mr. Fencl pleaded guilty to a misdemeanor conviction for carrying a firearm without a permit. This is his only prior conviction; he has no felonies. Because he has been a lifelong gun collector and hobbyist, and because he had hoped to be granted a license to carry a firearm for protection when he drove to repair trucks in desolate areas in the night, he and his state counsel negotiated the probationary terms of his misdemeanor conviction to not prohibit his legal possession of firearms altogether, but to only prohibit the unlawful possession of firearms.

On June 28, 2021, Mr. Fencl was arrested as his home in El Cajon. El Cajon Police Officers had mistakenly believed that Mr. Fencl was still on probation, and a SWAT team arrived at his home. They proceeded to search his home without a warrant and seize every firearm and firearm part that they saw. In total, 110 firearms were seized.

Mr. Fencl has been indicted for his alleged failure to register a handful of those firearms and alleged silencers. (Doc. 53.) He was released on bond in November of 2021. (Doc. 23.) His conditions of release, specifically Standard Condition 4, required Mr. Fencl to transfer any firearms (or gun parts) in his possession and prohibit him from possessing or attempting to possess any firearm (or gun part) as a condition of his release. (Doc. 12.) As officers seized every firearm and firearm part in Mr. Fencl's possession at the time of the search, this condition was complied with at the time of his release. Officers have not returned to Mr. Fencl any firearm or firearm part seized to date, even those unrelated to the pending charges.

### III.  Argument

The text of the Second Amendment states, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In recent years, to determine whether government action infringes on this right, the Ninth Circuit and other federal courts of appeals applied a two-step test: First, they analyzed whether the challenged regulation was consistent with the Second Amendment's text and history. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases). Second, they balanced the challenger's Second Amendment interests against the government interests supporting the law. *See id*.

But in a watershed opinion, the Supreme Court held that this second step was "one step too many." *Bruen*, 142 S. Ct. at 2127. Courts may not "apply[] means-end scrutiny in the Second Amendment context." *Id.* at 2127. "The Second Amendment is the very *product* of an interest balancing by the people" and thus "demands our unqualified deference." *Id*. at 2131 (quotations omitted) (emphasis *Heller*'s).

Instead, the Supreme Court adopted a methodology "center[ed] on constitutional text and history." *Id*. at 2128–29. Initially, a court reviewing a gun regulation must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id*. at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2130, 2126. Going forward, *Bruen* provides the only relevant test for determining whether a gun law is constitutional.

This case presents the question whether Standard Condition 4, as authorized by 18 U.S.C. § 3142(c)(1)(B)(viii), satisfies *Bruen*'s strictures. For the reasons given below, it does not. The magistrate court erred by concluding otherwise. This Court should therefore remove the condition.

## A. No binding precedent forecloses a Second Amendment challenge to pretrial release conditions.

Mr. Fencl's challenge to the constitutionality of Standard Condition 4 and 18 U.S.C. § 3142(c)(1)(B)(viii) appears to be an issue of first impression in this circuit. Neither the Supreme Court nor the Ninth Circuit—before or after *Bruen*—has ever ruled on the constitutionality of a complete prohibition on gun possession by individuals on pretrial release. *Bruen* did not address this issue, either. Mr. Fencl is therefore not requesting that this court upend established precedent or deem *Bruen* clearly irreconcilable with any prior holding of the Ninth Circuit. Instead, Mr. Fencl asks only that this Court faithfully apply the framework set forth by *Bruen* to analyze the constitutionality of Standard Condition 4.

### 1. No Ninth Circuit precedent controls this Second Amendment challenge.

First, no Ninth Circuit precedent controls this case. The Ninth Circuit has not considered a Second Amendment challenge to pretrial release conditions. Nor has the Ninth Circuit addressed the related question whether 18 U.S.C. § 922(n)—

a statute prohibiting persons under indictment from receiving or transferring firearms—violates the Second Amendment.

That distinguishes this challenge from challenges to, e.g., the federal felon-in-possession statute in 18 U.S.C. § 922(g)(1). *See, e.g.*, *United States v. Hill*, No. 21-CR-107-WQH, 2022 WL 4361917, at *2 (S.D. Cal. Sept. 20, 2022). Prior to *Bruen*, the Ninth Circuit held that § 922(g)(1) did not violate the Second Amendment. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1116 (9th Cir. 2010). That precedent continues to bind lower courts, even after *Bruen*, unless it was "clearly irreconcilable with [*Bruen*'s] reasoning or theory." *Hill*, 2022 WL 4361917, at *2 (quoting *Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003)). When considering post-*Bruen* § 922(g)(1) challenges, then, courts must decide as a threshold matter whether *Bruen* overruled prior case law. *See id*.

This challenge, however, does not present that threshold question, because there is no binding Ninth Circuit case law to begin with. Thus, this Court must proceed directly to applying *Bruen*'s test.

## 2. *Heller* does not validate pretrial release restrictions, as they are neither "presumptively lawful" nor "longstanding."

*District of Columbia v. Heller*, 554 U.S. 570 (2008), does not control this challenge, either, because gun restrictions on pretrial releasees are not among *Heller*'s "presumptively lawful" regulations. 554 U.S. at 626–27 & n.26.

In *Heller*, the Supreme Court clarified that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," firearms restrictions in "sensitive places," or regulations on gun sales. *Id*. at 626–27. The Court described these as "presumptively lawful regulatory measures." *Id*. at 627 n.26. The Ninth Circuit has relied on this language to uphold laws that fall within *Heller*'s list. *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016).

For regulations that are neither longstanding nor included in *Heller*'s list, however, *Heller*'s presumption of lawfulness does not apply. On this point, *Chovan* is instructive. In *Chovan*, the government attempted to extend the "presumptively lawful" label to § 922(g)(9), which regulates domestic violence misdemeanants. 735 F.3d at 1137. The government reasoned that, like restrictions on felons and the mentally ill, "§ 922(g)(9) is part of a long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent." *Id*.

The Ninth Circuit rejected that argument for two reasons. First, it noted that "[s]ection 922(g)(9) is not mentioned in *Heller*." *Id*. And second, it observed that the government had not produced historical evidence showing a "longstanding" historical tradition of regulating domestic violence misdemeanants' gun possession. *Id*. Because of "the lack of historical evidence in the record," the *Chovan* court was "certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors." *Id*. Thus, the court concluded, "[w]e must assume . . . that [the defendant's] Second Amendment rights are intact[.]" *Id*.

*Chovan*'s analysis dictates the same result here. Pretrial release conditions limiting gun rights are not mentioned in *Heller*. Nor are they longstanding. As the magistrate judge found, "the regulation in question came about . . . fewer than 40 years ago." Doc. 72 at 5. More importantly, any attempt to analogize to *Heller* violates violates *Bruen* itself. *Bruen* made clear that the "[o]nly" way to validate a gun restriction is through textual and historical analysis. 142 S. Ct. at 2126. It does not permit courts to uphold gun laws by analogizing to *Heller*'s "presumptively lawful" list.

For all these reasons, *Heller* does not control the outcome here.

6

### 3. *Bruen* does not hold that only "law-abiding citizens" receive Second Amendment protection.

Finally, *Bruen*'s references to the rights of "law-abiding citizens" does not foreclose this challenge.

As an initial matter, that language does not apply here, because Mr. Fencl has not been convicted of the charged felonies. Mr. Fencl is therefore presumed innocent, just as he would have been in the eighteenth century. *See Coffin v. United States*, 156 U.S. 432, 454–56 (1895) (describing the presumption's deep common law roots). The magistrate judge asserted that "[a]s an individual charged with a crime based on a finding of probable cause," Mr. Fencl "does not qualify as a 'law-abiding' person protected by the Second Amendment." Doc. 72 at 4. But he cited no authority, and Mr. Fencl is aware of none, for the proposition that someone the government has accused of a crime but who has not been adjudicated guilty would not, at the time of the founding, have been considered a "law-abiding or responsible citizen."

In any case, *Bruen* cannot be read to affirmatively hold that only law-abiding citizens receive Second Amendment protection. Courts addressing similar language in *Heller* have explained why. First, *Heller* and *Bruen* simply are not about whether the Second Amendment applies only to "law-abiding citizens"; that was "not part of the calculus" in these cases. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012). Because both cases were brought by law-abiding citizens, the opinions did not consider whether others could carry guns. Accordingly, as the Ninth Circuit has squarely found, "the *Heller* decision did not resolve *who* had the Second Amendment right." *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019). Likewise, *Bruen* "decides nothing about who may lawfully possess a firearm." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).

Second, neither case ever says—even in passing—that only law-abiding citizens receive Second Amendment protection. "While some of *Heller*'s [and *Bruen*'s] language does link Second Amendment rights with the notions of 'law-

abiding citizens' . . . ., those passages did not reflect an attempt to define the . . . 'people'" encompassed by the Second Amendment. *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). And there is no other indication that the Supreme Court used this language "deliberately to settle the question." *Huitron-Guizar*, 678 F.3d at 1168. Rather, these opinions' law-abiding language is "precautionary." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). "Instead of resolving questions" about the scope of the Second Amendment right, it "t[ells] us that the matters have been left open." *Id*.

Thus, to the extent that the magistrate judge intended to suggest that either *Heller* or *Bruen* held that the Second Amendment excludes anyone who the government believes to be other than "law-abiding," such a suggestion is unsupported by those decisions themselves. It is also foreclosed by *Chovan*, which held that a group of lawbreakers—domestic violence misdemeanants—receive Second Amendment protection. 735 F.3d at 1137. For this additional reason, *Bruen* does not bar this challenge.

**B.      Under *Bruen*'s "text, history, and tradition" framework, Standard Condition 4 and 18 U.S.C. § 3142(c)(1)(B)(viii) violate the Second Amendment.**

Thus, this Court must apply *Bruen*'s test to Standard Condition 4 and 18 U.S.C. § 3142(c)(1)(B)(viii) for the first time. As noted above, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

- If the government cannot do so, the law is unconstitutional.

*Bruen* 142 S. Ct. at 2129–30 (quotations omitted). Applying this test, the pretrial release condition here is unconstitutional.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 1. The Second Amendment's plain text covers Mr. Fencl's proposed course of conduct.

Mr. Fencl's conduct is presumptively lawful because it falls within the Second Amendment's plain text.[1] At the outset, Mr. Fencl is "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. That includes persons under indictment. Indeed, even convicted "felons" are not "categorically excluded from our national community," let alone persons merely accused. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting); *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).

Comparison to other constitutional amendments confirms this view. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . [and] the First and Second Amendments." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Pretrial releasees are among "the people" who enjoy Fourth Amendment protection. Const. Amend. IV; *see, e.g.*, *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006). And persons on pretrial release likewise enjoy "the right of the people" covered by the First Amendment. Const. Amend. I; *see, e.g.*, *United States v. Collins*, 2012 WL 3537814, at *4 (N.D. Cal. Mar. 16, 2012). If a person on pretrial release is one of "the

---

[1] The magistrate judge concluded that *Bruen*'s "law-abiding" language placed non-law-abiding persons outside of the Second Amendment's "plain text." Doc. 72 at 3. But as explained above, that is not what *Bruen* said. Instead, *Bruen* instructed courts to answer the "plain text" question by engaging with the actual words used in the Second Amendment. *Bruen*, 142 S. Ct. at 2134–35. The magistrate judge did not do so here. Thus, the magistrate judge neither applied the proper legal test nor reached the correct conclusion.

people" protected by the First and Fourth Amendments, *Heller* teaches that they are one of "the people" protected by the Second Amendment, too.

Additionally, the Second Amendment's plain text protects Mr. Fencl's "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, that is, "to possess and carry weapons in case of confrontation.'" *Id.* at 2135 (quoting *Heller*, 554 U.S. at 592). Thus, his possession of a firearm for self-defense is "presumptively guarantee[d]." *Id*.

### 2. The government cannot show an historical tradition of restricting firearm possession by individuals under supervision as a result of pending criminal charges.

The burden therefore falls squarely on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. If the government cannot do so, the infringement cannot survive.

### (a) The government must identify "distinctly similar" regulations, not just historical analogues.

At the outset, this Court must determine what kind of evidentiary showing will satisfy the government's burden in this case. As *Bruen* explained, this Court's historical inquiry will vary depending on the challenged regulation. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Bruen*, 142 S. Ct. at 2131. Courts should begin by deciding whether "a distinctly similar historical regulation address[ed] the problem." *Id*. If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id*.

In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id*. at 2132. Courts may then ask whether historical regulations and the challenged regulation are

10

"relevantly similar," with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132–33.

Here, the need to regulate individuals charged with crimes is "a general societal problem that has persisted since the 18th century." *Id*. at 2131. Thus, the government must point to regulations that are "distinctly similar" to Standard Condition 4 in order for the condition to pass constitutional muster. *Id.* at 2131.

The magistrate judge elided this distinction, apparently believing that the government must identify only an "historical analogue" to the challenged condition. *Id*. at 2131. The magistrate judge used some form of the word "analogue" no fewer than 10 times in his decision. Doc. 72. That was error. Because the problem of regulating individuals charged with crimes has existed since the founding, reasoning by analogy is not permitted. *Id.*

### (b)   No "distinctly similar" regulations emerged until the 20th century.

The government cannot meet its burden to identify "distinctly similar" regulations because no such regulations existed. Indeed, the first attempt within the federal system to permit courts to restrict firearm access as a condition of pretrial release came less than 40 years ago, with passage of the 1984 Bail Reform Act. *See* 18 U.S.C. § 3142(c)(1)(B)(viii).

The earliest understanding of pretrial release in the United States was imported from England, where the 1689 Bill of Rights prohibited the imposition of excessive bail or fines in language that was eventually incorporated virtually without change into the United States Constitution. *Compare* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflected."), *with* English Bill of Rights, 1689, 1 W.&M., c. 2 (Eng.) (declaring "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). Many states adopted similar language in their state constitutions. *See, e.g.*, Va. Const. art. I, § 9 ("[E]xcessive bail ought not to be

required"); Mass. Const. art. XXVI ("[N]o . . . court of law, shall demand excessive bail"); Pa. Const. of 1776, § 1776 ("All prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or presumption great."); N.C. Const. of 1776, § XXXIX (same). The centrality of bail to the system of pretrial release was codified by the first Congress in the Judiciary Act of 1789, which provided: "Upon all arrests in criminal cases, bail shall be admitted, except where punishment may be by death, in which cases it shall not be admitted but by the supreme court or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise in their discretion therein, regarding the nature and circumstances of the offense, and of the evidence, and the usages of law." Judiciary Act of 1789, ch. 20, 1 Stat. 73, 91 (1789). Thus, historical notions of pretrial release focused on the concept of posting money or property as the sole condition of release and guaranteed bail in all but capital offenses.

As a consequence, the government has failed to identify even one statute that existed at the time of the founding and mandated complete disarmament as a precondition of pretrial liberty. The earliest federal attempt to regulate firearm possession solely on the basis of pending criminal charges did not occur until nearly 150 years later when, in 1938, passage of the Federal Firearms Act of 1938 prohibited for the first time individuals under indictment for a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce. 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). Even that Act, however, was limited to individuals who were indicted—not merely accused—of crimes. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 702 (2009). The Act further limited its application to individuals who were charged with "crimes of violence," which was understood to include only crimes "ordinarily committed with the aid of firearms." *Id.* Not until 1961 did Congress expand § 2(e) to encompass all indicted individuals, regardless of the nature of the indicted offense. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed).

Even by 1961, however, the statute included only individuals subject to formal indictment for felony offenses. *Id.* To this day, no federal law restricts the Second Amendment rights of individuals charged with crimes by means of a complaint or information. Nor does any federal law bar individuals under indictment from merely possessing firearms. Rather, the modern version of the law prohibits individuals under indictment from receiving, shipping, or transporting firearms, but not from possessing them. *See* 18 U.S.C. § 922(n).

As for bail decisions, the Judiciary Act of 1789 governed pretrial release until 1966, when Congress—fed up with the rise of cash bail and the disproportionate effect such systems had on poor defendants—passed the Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214–217 (codified as amended at 18 U.S.C. §§ 3141 –51); *see also* S. Rep. No. 225, 98th Cong., 2d Sess. 5 (describing the purposes of the 1966 Act). The 1966 Act was designed to replace the prior emphasis on monetary bail with a system of custodial supervision designed to effect the same purpose. Rather than being required to post bail, individuals would instead be released on conditions of supervision. *Id.*

Significantly, however, none of these conditions restricted the defendant's access to firearms. *Id.* Instead, the 1966 Act directed judges to release noncapital federal defendants on their own recognizance or on an unsecured appearance bond unless the court determined they were a flight risk. 18 U.S.C. § 3146(a) (1964 ed., Supp. II). In the event the court determined the defendant was a risk of flight, the court was ordered to impose the least restrictive of a series of specifically enumerated conditions, which included (1) release to a first- or third-party custodian; (2) travel and associational restrictions; (3) cash or secured bail; and (4) nighttime incarceration. *Id.* Restrictions on the use or possession of firearms appear nowhere in the act.

Not until 1984, when Congress repealed the Bail Reform Act of 1966 with passage of the Bail Reform Act of 1984, did federal law authorize judges to impose a restriction on the possession of firearms as a condition of pretrial release. *See* Pub. L.

98-473, § 203, 98 Stat. 1976, 1977 (codified as amended at 18 U.S.C. § 3142(c)(1)(B)(viii)). The 1984 Act, which remains in effect today, for the first time authorized judges to impose a condition that the defendant "refrain from possessing a firearm, destructive device, or other dangerous weapon" in connection with an order of pretrial release. *Id.* Thus, the idea that individuals should be prohibited from possessing firearms as a condition of release from pretrial detention is of extremely recent vintage.

It is no coincidence that these restrictions arose only in the latter half of the twentieth century. For the vast majority of English and American history, bail decisions "served the sole purpose of returning the defendant to court for trial, not preventing her from committing additional crimes." Shima Baradaran, *Restoring the Presumption of Innocence*, 72 Ohio St. L.J. 723, 731 (2011). "English judges set bail with only one purpose: to ensure the defendant's appearance in court." *Id.* at 732. American courts followed this tradition. *See id.*; *Stack v. Boyle,* 342 U.S. 1, 5 (1951) ("Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant."). The Bail Reform Act of 1966 was "the first law in America—colonial, territorial, federal, or state—that allowed judges to consider 'danger to the community or any other person' as a reason for denying bail." Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 958 (2013). It was only in the wake of this late-20th-century innovation that the accused could be deprived of their firearms—a condition clearly aimed at dangerousness rather than flight.

In short, the government cannot show that this Nation has a history of restricting possession of firearms to people like Mr. Fencl, who has solely a misdemeanor conviction for a non-violent offense.  As noted above, Mr. Fencl is a United States citizen. He wishes to have his firearms available for work and for self-defense. Mr. Fencl is under no legal prohibition—other than Standard Condition 4—that would prohibit him from lawfully owning guns.

Because the government cannot show that this Nation's founders would have barred gun possession by individuals with no felony convictions and no convictions for violent offenses simply because they were charged with a crime, § 3142(c)(1)(B)(viii) and Standard Condition 4 are unconstitutional, particularly in Mr. Fencl's case.

**(c)      Surety statutes do not justify Standard Condition 4, and in fact, they further evince its illegality.**

In reaching the opposite conclusion, the magistrate judge pointed to so-called "surety statutes." Doc. 72 at 5–6. These laws do not begin to validate Standard Condition 4.

As an initial matter, surety statutes are not "distinctly similar" to Standard Condition 4, as the magistrate judge's opinion appears to concede by claiming that they are merely a "historical analogue" to the challenged condition. Doc. 72 at 11. Surety statutes "required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148. They therefore allowed "an accused arms-bearer [to] go on carrying without criminal penalty so long as he posted money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if he needed self-defense." *Bruen*, 142 S. Ct. at 2148 (simplified). Thus, there is "little reason to think that" these laws "would have prevented anyone from carrying a firearm for self-defense." *Id*. In contrast, Standard Condition 4 prohibits Mr. Fencl from possessing guns anywhere (even in the home), for any reason (even in self-defense), and under any conditions (even after paying a bond).

Surety statutes therefore cannot satisfy the government's burden. On this point, *Quiroz* is instructive. The defendant in *Quiroz* was convicted at trial of buying a gun while under indictment for criminal charges by the state of Texas, violating § 922(n). 2022 WL 4352482, at *1. After *Bruen*, the Texas district court set aside the verdict. *Id*. It did so following a careful historical analysis showing

15

that the United States has no historical tradition of prohibiting gun ownership based solely on indicted status. *Id.* at *4–8.

The court reasoned that surety statutes not only "fail to support" the Government's power to restrict persons under indictment from receiving guns; they "actively cut against" such arguments. *Id.* at *7. *Bruen* instructs that "if earlier generations addressed [a general societal problem that has persisted since the 18th century], but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at *7 (quoting *Bruen*, 142 S. Ct. at 2131). Here, surety statutes "addressed the societal fear that those accused [of posing a danger]—like those under indictment—would make an unlawful use of their firearm." *Id.* at *8 (simplified). Yet, as just explained, "surety laws addressed that fear through means 'materially different' than § 922(n)." *Id.* (quoting *Bruen*, 142 S. Ct. at 2131). Under *Bruen*, this is "evidence that [the] modern regulation is unconstitutional." *Id.* (quoting *Bruen*, 142 S. Ct. at 2131).

There is another problem with this comparison: Even if it were permissible to rely on merely analogous regulations, which it is not, the regulations relied upon below are not "relevantly similar," particularly with respect to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132–33. "[H]ow" surety statutes burdened gun rights—by requiring a bond to publicly carry guns—is not remotely comparable to the complete prohibition encompassed in Standard Condition 4. *Id.* And "why" they burden gun rights is not a match either. *Id.* Surety statutes applied only on a specific showing that the individual was likely to pose a danger or breach the peace. *Id.* at 2120. Mr. Fencl has never been accused of acting violently or breaching the peace with his firearms. *Id.*

In reaching the opposite conclusion, the magistrate judge evaluated the "how" and "why" at far too high a level of generality. As *Bruen* showed, courts may not derive broad, generalized regulatory power from narrow, specific regulations. New York tried this tactic, justifying its proper-cause requirement by pointing to a variety of

regulations that limited public carry. But the Supreme Court concluded that New York's proposed laws were nothing but a set of "well-defined" restrictions: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner by which one carried arms" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). The Court rejected New York's attempts to extrapolate, from these specifics, the power to enact "*broad* prohibitions on *all* forms of public carry." *Id*. at 2145; *see also id*. at 2138 (concluding that "well-defined" public carry restrictions do not justify "broadly prohibiting" public carry).

New York also attempted to characterize the proper-cause requirement as a "'sensitive places' law," similar to historical prohibitions on carrying firearms in places like legislative assemblies and courthouses. Like these regulations, New York claimed, the proper-cause requirement restricted public carry in "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." The Court rejected that comparison. The Court agreed that New York had identified some very general similarities between the sensitive-places laws and the proper-cause requirement. "It [was] true that people sometimes congregate[d] in 'sensitive places,'" the Court agreed, "and it [was] likewise true that law enforcement professionals are usually presumptively available in those locations." But by "expanding the category of 'sensitive places' simply to *all* places of public congregation that are not isolated from law enforcement," New York "define[d] the category of 'sensitive places' *far too broadly*." (emphasis added).

The comparison between Standard Condition #4 and surety statutes suffers from the same flaws. True, the magistrate judge identified some extremely generalized similarities between the two: that surety statutes restricted only "a discrete group of people and not the public generally" and that the restrictions "existed for the purpose of public safety." Doc. 72 at 5–6. But that does not mean that the government can bar

17

any discrete group of people from carrying guns as long as they do so in the name of public safety. That defines the government's power far too broadly.

In short, the presence of surety statutes show, at best, that a cash bond—which Mr. Fencl has already paid—may be required to secure release from jail and the rights that come along with release, including the right to own guns. They do not validate the wholesale restriction in Standard Condition #4.

### (d)   The government's power to detain cannot support Standard Condition #4.

Below, the government also argued that pretrial detention itself validates Standard Condition #4, because the "greater power" to detain implies the "lesser power" to restrict firearms use on pretrial release. Doc. 69 at 3. Two authorities refute this reasoning: Ninth Circuit precedent and the Constitution itself.

In *Untied States v. Scott*, the Ninth Circuit concluded that "[t]he right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions." 450 F.3d 863, 866 n.5 (9th Cir. 2006). The court acknowledged "the tempt[ation] to say that" conditions of pretrial release—"where a citizen waives certain rights in exchange for a valuable benefit the government is under no duty to grant—are always permissible." *Id*. But the court rejected that logic under the "unconstitutional conditions doctrine." *Id*. That doctrine limits the government's ability to infringe on "constitutional right[s] [that] function[] to preserve spheres of autonomy." *Id*. (simplified). Applying that doctrine in *Scott*, the court concluded that the state's right to keep the defendant in pretrial detention—where they could freely search him and his cell—did not imply a right to unconstitutionally search his private home while on release. *Id*. at 873 & n.14.

One can reach the same conclusion from the structure of the Constitution. The state undoubtedly has the power to deny bail to at least some persons, as it has done since the Founding. *United States v. Salerno*, 481 U.S. 739, 753–54 (1987). On the government's reasoning, the "greater" power to deny bail altogether should imply a

"lesser" power to set exorbitant bail. But the Eighth Amendment says the opposite: If the state does set bail, that bail may not be excessive. *Id*. Thus, the Founders themselves deemed pretrial releasees to have different and greater rights than detained persons.

In sum, the government's regulatory powers today must mirror those that the government exercised at the Founding. And at that time, detained persons were not permitted to have weapons, but persons on pretrial release were. As *Scott* and the Eight Amendment show, there is no inconsistency there. Those practices therefore delimit the bounds of the government's power.

### (e)  The government cannot rely on historical regulations impacting persons convicted of felonies.

Failing these comparisons, the government may fall back on historical comparisons used to justify disarming persons *convicted* of crimes. Doc. 32 at 13–18. But those regulations are not analogous, because Mr. Fencl is only *accused* of a crime. An "inability to see a constitutionally relevant distinction . . . between someone who has been convicted of a crime and someone who has been merely accused of a crime but is still presumed innocent overlooks both common sense and [binding] caselaw." *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) (simplified). "[A]fter all, [defendants are] constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt." *Id*.

Even if the government could rely on case-law concerning persons found guilty, the three typical historical examples—(1) execution of felons, (2) proposals from state constitutional conventions, and (3) a desire for a virtuous citizenry—still would not justify Standard Condition 4..

Most importantly, these arguments purport to show only that the public would not have understood the Second Amendment to bar regulations like Standard Condition 4. But nebulous "understandings" do not satisfy *Bruen*'s strictures. *Bruen* requires evidence that Standard Condition 4 "is consistent with this Nation's historical tradition of firearm *regulation*." 142 S. Ct. at 2126 (emphasis added). The government

can meet its burden only with actual *regulations*. *Id.* at 2131–34. General understandings—never codified in regulations—carry no weight. *Id.*; *see also Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996, at *7 (N.D. Tex. Aug. 25, 2022) (rejecting arguments based on "general Founding-Era attitudes").

Furthermore, these arguments lack historical support and are incompatible with modern constitutional doctrine. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting). As to felon execution, that some felons were once stripped of all rights through execution is irrelevant to the understanding of a constitutional right. "[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting).

Regardless, by the founding era, execution was not the dominant form of punishment even in England. Between 1718 and 1769, only about 15.5% of felons convicted in London's chief criminal court received the death penalty. Javier Bleichmar, *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound For America: The Transportation Of British Convicts To The Colonies* 1718-1775, at 21 (1987)). Execution was even less common in the early United States. As James Wilson, a leading Founder, told a Virginia grand jury in 1791, "how few are the capital crimes, known to the laws of the United States, compared with those known to the laws of England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 52 (2012) (citation omitted).

As for virtue, there is no primary source evidence linking the arms right to a person's virtuousness; historians have cited *one another* to support the "virtue" theory. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting) (comparing the authorities supporting a virtuousness limitation to a "matryoshka doll"). To the extent that history suggests that the Framers stripped the

unvirtuous of certain rights, it was civic rights (such as jury service or voting), not individual rights (such as the freedom of speech). *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting). In fact, conditioning the Second Amendment's protections on virtuousness is inconsistent with *Heller*. *E.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). As several Third Circuit judges noted:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by [scholars] . . . who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia."

*Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 371 (3d Cir. 2016) (Hardiman, J., concurring).

Indeed, there is affirmative proof that the virtue theory is incorrect: Far from *prohibiting* indicted persons from bearing arms, founding-era laws *required* "each and every" able-bodied man to join armed militias—with no exception for those under convicted of crimes. *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). This defeats any inference that the accused were disarmed.

Finally, the "three proposals emerging from the ratification of the Constitution," if relevant at all, do not demonstrate a historical tradition of regulation akin to Standard Condition 4. *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *see also United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009).

As the states' conventions debated ratification, several proposed that the Nation's charter guarantee the right to bear Arms. *Id.*; Greenlee, *supra*, at 265–66;

21

1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such proposals included an arguable limitation on that right. First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326. Second, Samuel Adams argued at Massachusetts' convention that "the people of the United States, who are peaceable citizens," should not be deprived of their arms. *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)). Finally, a minority of Pennsylvania delegates—all Antifederalists who opposed ratification[2]—suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." *Id.* at 455 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). "[O]nly New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.*

As an initial matter, the proposals are an exceptionally weak form of evidence. None made it into the final text. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (explaining *expressio unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 604. That is because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id*. If these proposals really codified previous

---

[2] As *Heller* noted, it is "highly problematic" to assume that the "the best or most representative reading of" the Second Amendment "would conform to the understanding and concerns of the Antifederalists." *Id*. at 590 n.12.

practice, the government should be able to point to Founding-era laws imposing similar firearms restrictions. Yet no such laws exist.

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals arising from state conventions. The conventions in Rhode Island and New York proposed an unqualified version of the Second Amendment right, "[t]hat the people have a right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335. Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, two did not. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Finally, even if one assumes that the proposed limitations shed light on the actual Second Amendment's meaning, it does not legitimize disarming Mr. Fencl. The proposals would have placed some restrictions on arms for those who engaged in rebellion or violence.[3] Standard Condition 4 bars Mr. Fencl from possessing guns even though he has never been accused of acting violently. Those are not close to analogous. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support

_____

[3] Given Founding-era practice, the Pennsylvanian antifederalists' proposal cannot seriously be read to suggest that anyone convicted of *any* offense lacks a right to bear arms. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (noting that "no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants").

a lifetime ban on any 'felon' possessing any arms"); Greenlee, *supra*, at 267 (same); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar*, 980 F.3d at 915 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same).

### C.     The government cannot resort to means-ends balancing.

On a final note, the government cannot justify this regulation using means-ends balancing. The magistrate judge upheld the condition, in part, because "the Government's interest in community safety can outweigh the liberty interest of an individual person." Doc. 72 at 4. But *Bruen* prohibits "applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. So even if Standard Condition 4 *could* satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id*. at 2129 (quotations omitted). Thus, after *Bruen*, the issue is not whether the government can regulate the behavior of people on pretrial release as a general matter but rather whether the specific regulations at issue here— restriction on the right to bear arms—are supported by "distinctly similar" historical precedent. *Bruen* at 2131. For all the reasons explained in this motion, they are not, and Standard Condition 4 should be removed from Mr. Fencl's conditions of pretrial release.

## IV.   Conclusion

For these reasons, this Court should modify Mr. Fencl's conditions of pretrial release to remove Standard Condition 4.

Respectfully submitted,

Dated:  November 2, 2022        *s/ Holly A. Sullivan*
                               Holly A. Sullivan
                               Federal Defenders of San Diego, Inc.
                               Attorneys for Mr. Fencl
                               Email:  Holly_Sullivan@fd.org