UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>JOHN FENCL,<br><br>                              Defendant. | Case No.: 21-CR-3101 JLS<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**<br><br>(ECF No. 54) |

Presently before the Court is Defendant John Fencl's ("Defendant" or "Fencl") Motion to Suppress Evidence and Statements ("Mot.," ECF No. 54). The Government filed a Response in Opposition ("Opp'n," ECF No. 57) and Defendant submitted a Reply in Support ("Reply," ECF No. 59) thereof. Following an evidentiary hearing, the Parties submitted supplemental briefing on the Motion ("Mot. Supp.," ECF No. 82; "Opp'n Supp.," ECF No. 83). Having considered the Parties' arguments and the law, the Court **DENIES** the Motion.

### BACKGROUND

In September 2019, police arrested Defendant for illegally possessing a concealed gun without a license. ECF No. 1 at 3; Mot. at 2–3. On October 15, 2019, he pled guilty to a misdemeanor firearm offense and was sentenced to two years of probation, which

included a Fourth Amendment waiver. ECF No. 1 at 3; Mot. at 3. The terms of the waiver were that Defendant would "[s]ubmit person, vehicle, place of residence, property, [and] personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by a Probation Officer or other law enforcement officer." ECF No. 62 at 4. During Defendant's probationary period, California Governor Gavin Newsom signed California Assembly Bill No. 1950 (2020 Reg. Sess.) ("AB 1950"), which, relevant here, amended California Penal Code § 1203a to limit the length of probation terms to one year for most misdemeanor convictions. *See* Cal. Pen. Code § 1203a; ECF No. 57-8 at 2. While the statute was silent on whether AB 1950 applied retroactively, California courts soon concluded that the law was retroactive. *See e.g.*, *People v. Burton*, 272 Cal. Rptr. 3d 797, 800 (Cal. App. Dep't Super. Ct. 2020) (opinion issued November 9, 2020); *People v. Wilson*, No. E074285, 2021 WL 649780, at *9 (Cal. Ct. App. Feb. 19, 2021). Accordingly, when AB 1950 went into effect on January 1, 2021, it reduced Defendant's probationary period from two years to one year, effectively terminating Defendant's probation.

Subsequently, on April 23, 2021, El Cajon police conducted a traffic stop on Defendant for an expired registration. ECF No. 57-3 at 6. Background checks on Defendant and his passenger showed that both had Fourth Amendment waivers as conditions of probation or parole. *Id.* at 7. Upon searching Defendant's vehicle, El Cajon police officers discovered a bag containing a privately manufactured Glock-style handgun without a serial number. *Id.* at 8. Defendant informed the officers that he owned the handgun and that he had built it himself. *Id.* According to police, Defendant also stated that "he probably will always carry a gun with him." *Id.* at 9. As a result of the search, Defendant was charged with several crimes, including carrying an unregistered firearm, carrying a concealed weapon in a vehicle, and manufacturing or possessing a large-capacity magazine. *Id.* at 2. Defendant was also charged with possession of narcotics, but later tests revealed the suspected substance was acetaminophen, and the narcotics charges were dismissed. Mot. Supp. at 6.

At issue in this case is what happened next. El Cajon Police Detective Jason White was informed of Defendant following his arrest in April. Opp'n Supp. at 5. As part of the investigation, Detective White checked a law enforcement database known as SD Law. *Id.* The database informed Detective White that Defendant was on probation, the terms of which included a Fourth Amendment search waiver. *Id.* A colleague of Detective White then called court officials for information on Defendant. *Id.* at 5–6. The court officials informed the colleague that Defendant was on probation and subject to a search waiver. *Id.* Finally, Detective White called the San Diego County Probation Office, which informed him that Defendant was on probation and subject to a search waiver. *Id.* at 6. Based on this faulty information, Detective White began planning a warrantless search of Defendant's home. *Id.*

El Cajon police conducted the search on June 28, 2021. ECF No. 1 at 3. As officers approached Defendant's residence, Defendant stepped outside and walked towards them. ECF No. 57-4 at 5. According to Detective White, he and the other officers were concerned that Defendant was armed due to his previous statement that he "probably will always carry a gun with him." Opp'n Supp. at 7. They immediately detained him and conducted a pat-down search. *Id.* Defendant informed the officers that he had "something" on his hip. ECF No. 57-4 at 5. Police officers initially believed that "something" was a loaded handgun, though it was later determined to be a starter pistol with blank ammunition. *Id.* Defendant also informed the officers that there were firearms inside his residence. *Id.* The officers then began searching Defendant's residence. *Id.* They found more than one hundred firearms, including 10 personally manufactured firearms without serial numbers (commonly referred to as "ghost guns"), four silencers, three short-barreled rifles, and 21 other guns that are illegal under state law. *Id.* at 4. Defendant was ultimately charged with illegally possessing three unlicensed short-barreled rifles and four unlicensed silencers in violation of 26 U.S.C. §§ 5861(d), 5871. ECF No. 53.

/ / /

/ / /

Defendant now moves to suppress the evidence found inside his residence, arguing that the search violated his Fourth Amendment rights in at least three ways. First, Defendant "was not subject to a Fourth Amendment waiver at all because his probation was legislatively terminated six months before the raid." Mot at 7. Second, "Ninth Circuit law independently forbids officers from conducting suspicionless home raids of non-violent misdemeanor probationers—whether or not they are subject to a Fourth Amendment waiver." *Id.* Finally, "the officer seized Mr. Fencl's belongings indiscriminately and without particularized suspicion." *Id.* The Government opposes the Motion, arguing that "because Detective White reasonably relied on a database check, court records, and the unaffiliated San Diego County Probation Office in confirming Defendant's probation and its conditions, the good faith doctrine should apply." Opp'n at 8. Moreover, "officers had reasonable suspicion to believe that Defendant's home contained evidence of a crime because consistent with his prior statements, Defendant appeared to be armed when they conducted a pat-down search, and because he admitted that the home contained firearms." *Id.*

## DISCUSSION

### I. Good Faith Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Supreme Court, however, has recognized that the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Nonetheless, the Supreme Court has established an exclusionary rule which bars the use of improperly obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). This "judicially created rule" is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). In keeping with this purpose, the Supreme Court has held that the exclusionary rule applies only where it results in "appreciable deterrence" and is not automatically

imposed as the result of a Fourth Amendment violation. *See id.* at 141. Moreover, "to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial social costs exacted by the exclusionary rule.'" *Illinois v. Krull*, 480 U.S. 340, 352 (1987) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

Guided by these principles, the Supreme Court has declined to apply the exclusionary rule in instances "where the official action was pursued in complete good faith," *Michigan v. Tucker*, 417 U.S. 433, 447 (1974), otherwise known as the "good faith exception," *see United States v. Leon*, 468 U.S. 897, 924 (1984). Thus, in *United States v. Leon*, the Supreme Court held that when a police officer acts under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the officer acted in "objectively reasonable reliance" on the subsequently invalidated search warrant. 468 U.S. at 922. The Court reasoned that:

> Where the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty."

*Id.* at 919–20 (quoting *Stone v. Powell*, 428 U.S. 465, 539–40 (1976) (White, J., dissenting)). The good faith exception has since been applied to other instances where the Supreme Court has found that police acted in good faith and that application of the exclusionary rule would not further its objective of deterrence. *See Massachusetts v. Sheppard*, 468 U.S. 981 (1984) (exclusionary rule did not apply where police relied on warrant that was invalidated due to judge's failure to make "clerical corrections"); *Illinois v. Krull*, 480 U.S. 340, 349 (1987) (exclusionary rule did not apply where police acted in objectively reasonable reliance on statute later declared unconstitutional); *Arizona v. Evans*, 514 U.S. 1 (1995) (exclusionary rule did not apply when police reasonably relied on mistaken information in a court's database that an arrest warrant was outstanding);

*Herring v. United States*, 555 U.S. 135, 144 (2009) (exclusionary rule did not apply where officer reasonably believed there was an outstanding arrest warrant based on negligent bookkeeping error by another police employee); *Davis v. United States*, 564 U.S. 229, 239–40 (2011) (exclusionary rule did not apply where police conducted a search in objectively reasonable reliance on binding judicial precedent).

"The burden of demonstrating good faith rests with the government." *United States v. Camou*, 773 F.3d 932, 944 (9th Cir. 2014) (citing *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995)). "The test for good faith is an objective one: 'whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances.'" *Id.* (quoting *Herring*, 555 U.S. at 145); *see also Krull*, 480 U.S. at 348–49 ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975))). Further, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Herring*, 555 U.S. at 143. In other words, "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." *Id.* (quoting *Leon*, 468 U.S. at 911). Finally, the exclusionary rule is "aimed at deterring police misconduct"; legislators, judicial officers, and other public officials "are not the focus of the rule." *Krull*, 480 U.S. at 350. In sum:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring*, 555 U.S. at 144; *see also Davis*, 564 U.S. at 239 ("'[I]solated,' 'nonrecurring' police negligence . . . lacks the culpability required to justify the harsh sanction of exclusion." (quoting *Herring*, 555 U.S. at 137)).

## II. Reasonable Reliance

The Court must first determine whether the Government has demonstrated that the police acted in objectively reasonable reliance on the faulty information that Defendant was subject to a Fourth Amendment waiver at the time of the search of his residence. Defendant argues that Detective White was "grossly negligent in failing to realize that Mr. Fencl was off probation, even though he had investigated Mr. Fencl for two months before searching his home." Mot. Supp. at 10. The Government, on the other hand, argues that Detective White reasonably relied on three different sources confirming Defendant's probation status, and that any error is not attributable to the police department. Opp'n Supp. at 8–11.

Here, the Court finds that the Government has met its burden. First, there is no evidence that Detective White organized the search of Defendant's residence in a manner that was reckless, grossly negligent, or deliberately designed to violate Defendant's Fourth Amendment rights. In fact, the opposite is closer to the truth. White checked the SD Law database, asked a colleague to check court records, and called the San Diego County Probation Office to confirm Defendant's probation status. Opp'n Supp. at 5–6. Each source incorrectly informed him that Defendant was on probation subject to a Fourth Amendment waiver, but it was reasonable for Detective White to rely on them in planning the search. *Id.* Nevertheless, Defendant contends that White ignored a "sea of red flags" which should have "alerted him to the possibility that he needed to apply for a warrant." Mot. Supp. at 15. The Court is not convinced that any of these "red flags" would have alerted a reasonable officer to the unconstitutionality of the search.

Defendant's first "red flag" is a bulletin distributed by the Probation Department and recirculated to the El Cajon Police Department concerning the effects of AB 1950. *Id.* The bulletin, however, specifically recommended that law enforcement officers "contact the Probation Department directly rather than depending solely on any Law Enforcement data systems" for information on an individual's probation status. *See* Opp'n Supp. at 2. Prior to the search, White did exactly that and was informed by probation officials that Defendant

1  was on probation and subject to a Fourth Amendment waiver. *Id.* at 6. Thus, it is unclear
2  how the bulletin advances Defendant's argument. Defendant next suggests there was a
3  latent siren in "[t]he court file, which confirmed that Mr. Fencl was on misdemeanor
4  probation." Mot. Supp. at 15. But Defendant provides no explanation as to how
5  information contained in an official court record should have alerted White to the reality
6  of Defendant's probation status. The next alleged "red flags" are "[c]alling to the court to
7  check up on the impact of AB1950," "[c]alling to speak further with probation after
8  checking the database," "[d]oing basic math to see if Mr. Fencl's probation term was over
9  a year old." *Id.* All three are simply recommendations for further investigation. Defendant
10 has not shown that a reasonable police officer would take such measures under the
11 circumstances. Indeed, each recommendation ignores the fact that El Cajon police were
12 advised to contact the Probation Department to confirm an individual's probation status
13 rather than rely on their usual research methods. *See* Opp'n Supp. at 2, 6. Moreover, the
14 Court doubts the wisdom and efficiency of instructing non-experts to conduct their own
15 legal analysis of an individual's probation status prior to taking law enforcement action.
16 Finally, the last alert highlighted by Defendant is "information learned while searching Mr.
17 Fencl's home." Mot. Supp. at 15. Such information arose only after the search had been
18 initiated, and thus has no bearing on whether White acted in objectively reasonable reliance
19 on the antecedent incorrect information supplied to him.

20 In the alternative, Defendant argues that the El Cajon Police Department's training
21 on AB 1950 constituted systemic negligence. Defendant characterizes the training as
22 "barebones," consisting only of the aforementioned training bulletin advising officers to
23 contact the Probation Department to confirm the probation status of a person before taking
24 any enforcement action. Mot. Supp. at 12. According to Defendant, a "reasonably well
25 trained officer would have known" that that the City Attorney's Office, not the Probation
26 Department, handles misdemeanors; thus, a reasonable officer would have consulted
27 sources other than the Probation Department. *Id.* at 12–13.
28 / / /

Defendant misapplies *Herring's* good faith test. The test is whether a reasonably well-trained officer would have known that the search was illegal; not whether a reasonably well-trained officer would have known which public agency was tasked with implementing a statute. *See Herring*, 555 U.S. at 145. Further, the argument assumes that the City Attorney's Office would have provided the correct information to an inquiring police officer, but Defendant has offered no supporting evidence for this assumption. Even if Defendant were applying the *Herring* test appropriately, the argument still fails. Other than a casual remark from this Court, Defendant has not provided any evidence that a reasonable officer would have known to contact the City Attorney's Office for information on a misdemeanant's probation status in the wake of AB 1950's passage. Mot. Supp. at 12–13. Finally, Defendant's argument also ignores the fact that the training bulletin originated from the Probation Department, not the police department. *See id.* at 15 (noting the training bulletin was "sent out by County Probation and recirculated to all personnel of the El Cajon Police Department"). The Probation Department's failure to identify the appropriate agency to contact for information on misdemeanor probation is not a concern of the exclusionary rule. *See Krull*, 480 U.S. at 350 (noting exclusionary rule is "aimed at deterring police misconduct"); *Leon*, 468 U.S. at 916 (same).

Under the circumstances, following recommendations from the Probation Department, one of the agencies tasked with bringing about AB 1950's changes, was not unreasonable. *See Camou*, 773 F.3d at 945 (noting that under Supreme Court precedent, good faith exception is applicable where an officer "*reasonably relied on* an external source, which turned out to be erroneous"). AB 1950's passage was an isolated event that affected numerous probationers in the State of California, and its implementation required the efforts of multiple public agencies, as well as interpretation by California courts. *See* Mot. at 4; *supra* p. 2. As Defendant notes, AB 1950's "sea change" was achieved "through a collaboration between the Superior Court, the District Attorney, the Public Defender, the City Attorney, and the Probation Department." Mot. at 4. Defendant brushes aside any confusion that could have resulted in such a scenario and suggests local police could have

simply calculated an individual's probation term themselves or performed their own legal research into the effects of AB 1950. Mot. Supp. at 15. Reasonable police officers, however, would recognize the intricacies of the situation and defer to instruction from the agencies tasked with actualizing the new law.

Finally, despite describing El Cajon Police Department's alleged negligence as systemic, Defendant has failed to cite even one other instance in which El Cajon police, or any police department in California, conducted a search pursuant to a misdemeanant's Fourth Amendment waiver that had expired upon AB 1950's effective date. *See generally* Mot.; Mot. Supp. Nor has Defendant shown that such conduct is likely to recur. Given the isolated and unique nature of the unconstitutional conduct in this case, it is unclear how application of the exclusionary rule could deter future police misconduct.

Defendant analogizes to *United States v. Song Ja Cha*, 597 F.3d 995 (9th Cir. 2009) to support his argument that the El Cajon Police Department's training constituted systemic negligence that could be deterred through suppression of evidence. There, evidence seized from the defendants' home and adjoining business was suppressed because local police conducted an unreasonably long 26.5-hour search of the premises. *Id*. at 997. The Ninth Circuit held that the good faith exception did not apply because the police misconduct in that case was "systemic." *Id*. at 1004. The local police had not been instructed that "time was of the essence once the police have secured a premises or that the police had to act with deliberate haste to obtain the warrant." *Id*. at 1005. The Ninth Circuit concluded that the local police department's "failure to know the governing law was reckless behavior." *Id*. Here, however, unlike in *Song Ja Cha*, the El Cajon Police Department was relying on information from an external source; not their own training program. Moreover, the Ninth Circuit in *Song Ja Cha* explained that its precedent "distinguishes between mistakes of fact and mistakes of law because mistakes of law can be deterred more readily than mistakes of fact." *Id*. at 1005. In *Song Ja Cha*, the officers were operating under a mistake of law; here, the officers were operating under a mistake of fact. Thus, here, the exclusionary rule lacks the potency it had in *Song Ja Cha*.

The Court recognizes that the police conduct here intruded upon Defendant's expectation of privacy in his home, which is the "very core" of the Fourth Amendment's protections. *Silverman v. United States*, 365 U.S. 505, 511 (1961). The invasion, especially considering its nature (an eight-man investigation of Defendant's entire residence, *see* Mot. Supp. at 6) is not taken lightly. However, under these circumstances, application of the exclusionary rule on the basis of Detective White's investigation or the El Cajon Police Department's training would likely have no deterrent effect. The errors that resulted in the unconstitutional conduct lie at the feet of other non-police agencies. Detective White prepared the search in a reasonable manner, and the El Cajon police department reasonably deferred to the Probation Department's recommendations concerning probation status checks in the wake of AB 1950's sea change, an event unlikely to repeat itself any time soon. Consequently, the Court finds that the police acted in objectively reasonable reliance on the third-party information concerning Defendant's probation status and would not have known that the planned search was unconstitutional.

## II.     Reasonableness of Search

While the Court has determined that police acted in objectively reasonable reliance on the faulty information concerning Defendant's probation status, the Court must still consider whether a reasonably well-trained officer would have known that the search of Defendant's residence was illegal despite the faulty information. In other words, assuming Defendant was on probation subject to a Fourth Amendment waiver at the time of the search, the exclusionary rule may still apply if the police performed the search in an unconstitutional manner. Consequently, the challenged police conduct must be assessed under the law governing searches of misdemeanor probationers subject to Fourth Amendment waivers.

"A warrantless search is unconstitutional unless the government demonstrates that it 'fall[s] within certain established and well-defined exceptions to the warrant clause.'" *United States v. Brown*, 563 F.3d 410, 414 (9th Cir. 2009) (quoting *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008)). One recognized exception is a warrantless

search of a probationer's residence when the search is "authorized by a condition of probation and supported by reasonable suspicion of criminal activity." *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009); *see also United States v. Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."). "Reasonable suspicion that a person is engaged in criminal activity 'is formed by specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017) (quoting *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002)). The reasonable suspicion standard "takes into account the totality of the circumstances." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).

Defendant argues that the search of his residence was not based on any suspicion of criminal activity, and even if the search of the residence was justified, the indiscriminate seizure of his firearms violated his Fourth Amendment rights. *See* Mot. at 10–15. The Government contends that "officers had reasonable suspicion to believe that Defendant's home contained evidence of a crime because consistent with his prior statements, Defendant appeared to be armed when they conducted a pat-down search, and because he admitted that the home contained firearms." Opp'n at 8. Moreover, contends the Government, the scope of the search was justified given the volume of firearms within the residence. Opp'n at 15–16.

Here, the Court concludes that the Government has demonstrated that a reasonably well-trained officer would not have known that the search was illegal because it was based on a good faith belief that the search was authorized by a Fourth Amendment waiver and supported by reasonable suspicion of criminal activity. First, there is no dispute that Defendant's probation terms included a Fourth Amendment waiver, which clearly subjected his residence "to search at any time with or without a warrant, and with or without

reasonable cause, when required by a Probation Officer or other law enforcement officer." ECF No. 62 at 4. As has already been established, the El Cajon police acted in objectively reasonable reliance on external sources indicating that the waiver was effective on the date of the search. Second, the search was based on reasonable suspicion of criminal activity. Defendant's conviction documents indicated that he was required to relinquish possession of all firearms and was prohibited from possessing firearms as a condition of his probation.[1] Additionally, the San Diego County Probation Office advised Detective White that Defendant was prohibited from owning firearms as a condition of his probation, and court officials informed Detective White's colleague that he was prohibited from owning firearms. Opp'n Supp. at 5–6. Accordingly, if police reasonably suspected Defendant of owning or possessing a firearm at the time of the search, a warrantless search of his residence would have been justified.

/ / /

---

[1] The Court notes an apparent inaccuracy in Defendant's conviction documents regarding his alleged firearm prohibition. ECF No. 62. The misdemeanor judgment minutes reflect that Defendant was advised that "within 10 years of this conviction, owning/possessing/having custody or control of any firearm is a crime pursuant to [California Penal Code § 29805]" and that Defendant was notified of a "firearm prohibition . . . per [California Penal Code § 29810]." *Id.* at 4. The cited sections, however, appear inapplicable to Defendant. Defendant pleaded guilty to unlawfully carrying a firearm in a public place in violation California Penal Code § 25850(a) and admitted to not being the registered owner of the firearm in violation of § 25850(c)(6). ECF No. 55, Ex. B. Section 29805 only restricts firearm possession of individuals convicted of particular misdemeanors, of which §§ 25850(a), (c)(6) are not included. Likewise, § 28910 requires individuals convicted of specific misdemeanors to relinquish all firearms, but §§ 25850(a), (c)(6) are not included in that list. Thus, Defendant's guilty plea does not appear to have subjected him to a 10-year prohibition on firearms possession per § 29805 or the relinquishment of his firearms per § 29810, despite the information contained within the judgment minutes. Defendant's misdemeanor plea agreement does not shed any light on this apparent inaccuracy. The plea agreement cites to different Penal Code sections for the requirement that Defendant relinquish possession of his firearms and merely states that Defendant agreed to "not unlawfully possess firearms." *See* ECF No. 55, Ex. B. Read literally, this could mean that Defendant's plea agreement permitted him to lawfully possess firearms. A literal reading of the plea agreement is inappropriate, however, as it would simply constitute an agreement not to commit a crime, which is a basic condition for the vast majority of probationers. Nevertheless, it is altogether unclear to the Court whether Defendant was subject to a valid firearm prohibition during the course of his probation. Such uncertainty, however, does not change the outcome of the analysis. As explained above, the exclusionary rule is concerned with police misconduct. Mistakes stemming from judicial and other non-police officials, such as the one described in this footnote, are not the concern of the exclusionary rule. *See Krull*, 480 U.S. at 350; *supra* p. 6.

Several "specific articulable facts" formed the basis for suspecting that Defendant owned or possessed firearms in apparent violation of the terms of his probation. In April 2021, Defendant was found to be in possession of a personally manufactured Glock-style handgun, and he told police that he owned the handgun and had made it himself. ECF No. 57-3 at 6–8. Defendant also told police that he "probably will always carry a gun with him." *Id.* at 9. Moreover, when police arrived to search Defendant's home in June 2021, he was armed with what appeared to be a lethal handgun and told police that he had firearms inside his residence. ECF No. 57-4 at 5. Each of these facts together lead to the objective and reasonable conclusion that Defendant was illegally manufacturing and/or in possession of firearms, and that his residence would contain evidence of the suspected criminal conduct. Consequently, a warrantless search of Defendant's residence would have appeared justified to officers acting in objectively reasonable reliance on the fiction that Defendant was on probation and subject to a Fourth Amendment waiver. Therefore, a reasonably well-trained officer would not have known that the search of Defendant's residence was illegal.

The Court also finds that the seizure of Defendant's weapons was performed in a reasonable manner. "Once police officers properly enter a residence pursuant to a probation search, they need only a 'reasonable suspicion' to conclude that the probationer owns, controls, or possesses a particular item within the probationer's residence in order to search that item." *United States v. Bolivar*, 670 F.3d 1091, 1096 (9th Cir. 2012). The standard governing whether police may seize the item, however, is unclear. In other contexts, "[c]ase law establishes a separate probable cause standard for seizure of items found where officers have a lawful right of access to the discovery of the items." *United States v. Barajas*, 517 F. Supp. 3d 1008, 1022 (N.D. Cal. 2021). For warrantless seizure of such items to be justified, "its incriminating character must also be 'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Defendant indicates that the "immediately apparent" standard is appropriate here, Mot. at 13, and the Government does not object,

*see generally* Opp'n. Accordingly, the Court will use the "immediately apparent" seizure standard for purposes of this case. *See United States v. Giannetta*, 909 F.2d 571, 578 (1st Cir. 1990) (concluding the "most appropriate seizure standard" during a probation search is the "immediately apparent" standard, which stems "from the rules governing 'plain view' seizures").

Here, there is no dispute that Defendant owned or possessed the items found within his residence; accordingly, the police had an apparent lawful ability to search all items within Defendant's residence. Moreover, the incriminating character of the firearms, ammunition, silencers, gas grenade, and firearm manufacturing equipment would have been immediately apparent to the officers, as they had been informed that Defendant was prohibited from possessing firearms under the terms of his probation. *See* ECF No. 57-4 at 2–8; Opp'n Supp. at 5–6. Therefore, the scope of the search of Defendant's residence and the seizure of the allegedly incriminating evidence was justified.

In sum, the Government has met its burden of showing that a reasonably well-trained police officer would not have known that the search was illegal in light of all the circumstances. The search of Defendant's residence was based on reasonable suspicion of criminal activity, the scope of the search was appropriate, and the seizure of his property was justified because the incriminating nature of the property would have been immediately apparent to police.

## CONCLUSION

In light of the foregoing, the Court **DENIES** Defendant's Motion to Suppress Evidence and Statements (ECF No. 54).

**IT IS SO ORDERED.**

Dated: January 5, 2023

Hon. Janis L. Sammartino
United States District Judge